IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LETTERRON DJON BRANNON,  )
#197855,                 )
                         )
        Plaintiff,       )
                         )
v.                       )        CASE NO. 2:21-cv-347-ECM-JTA
                         )        (WO)
TYLER PATTERSON, et al., )
                         )
        Defendants.      )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.    INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Letterron

Djon Brannon.[1] He asserts that, on February 18, 2020, when police arrested him at his

home in Opp, Alabama, Defendant Tyler Patterson unlawfully searched his person and his

home and unlawfully seized his property. Brannon argues that Patterson's actions were

unlawful because he had no warrant and no probable cause for the searches. (Doc. No. 1 at

4.) Brannon also claims that, following his arrest, Defendant Heather Koerner[2] failed to

secure his home and wrongfully prevented his family from securing his property. (Doc.

No. 1 at 5.) Brannon asserts Koerner's actions resulted in the loss of personal property and

his five dogs. He named multiple individuals as defendants in the complaint, but the only

---

[1] Brannon was a pre-trial detainee confined in the Covington County Jail at the time he filed his complaint.

[2] Investigator Koerner's name is misspelled in the complaint. (Doc. No. 1 at 2.) Her name is correctly spelled Heather Koerner. (Doc. No. 41-23.)

remaining defendants are Drug Task Force Agent Tyler Patterson and Investigator Heather Koerner.[3] Brannon seeks monetary relief for the alleged violations of his constitutional rights.[4] (Doc. No. 1 at 6; Doc. No. 34-1.)

Defendants filed answers, special reports, and supporting evidentiary materials addressing Brannon's claims for relief. (Docs. No. 41, 41-1 through 26, 42, 45, 45-1 through 45-6, 73, 74, 74-1 through 2.) In these documents, Defendants deny violating Brannon's constitutional rights.

The undersigned now construes Defendants' Special Reports (Docs. No. 41, 45, 74) as motions for summary judgment. For the reasons set forth below, the undersigned recommends that the motion for summary judgment filed by Defendants Turman and White (Doc. No. 45) be DENIED as moot[5] and that the remaining motions for summary judgment (Docs. No. 41, 74) be GRANTED.

## II.    JURISDICTION AND VENUE

This court exercises subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the Court finds sufficient allegations to support both in the Middle District of Alabama, Northern

---

[3] Defendants Becky Bracke, Opp City Mayor, and the Opp Police Department were dismissed as parties by Order of June 17, 2021. (Doc. No. 19.) By Order of November 4, 2022, the court dismissed without prejudice Brannon's claims against Defendants Blake Turman and Greg White. (Doc. No. 103.)

[4] Brannon initially sought monetary damages and injunctive relief in his Complaint, but later amended the Complaint to seek only monetary damages and declaratory relief. (Docs. No. 1, 34.)

[5] On Brannon's motion, Defendants Turman and White were dismissed from this action without prejudice on November 4, 2022. (Doc. No. 103.) Therefore, the motion for summary judgment filed by Defendants Turman and White (Doc. No. 45) is due to be denied as moot.

Division. This matter was referred to the undersigned for recommendation of disposition.[6]
(*See* Docs. No. 19, 94.)

### III.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. 56). The movant can meet this burden by presenting evidence showing there is no dispute

---

[6] *See* 28 U.S.C. § 636(b)(1).

3

of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of

the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## IV.    RELEVANT FACTS[7]

The following facts derive from Brannon's verified Complaint (Doc. No. 1), the sworn statements and evidentiary submissions provided by him (Docs. No. 64, 69, 70-1 through 70-5; 86-1 through 86-3, 95-1), and the sworn evidentiary materials provided by Defendants (Docs. No. 41-1 through 41-26[8], 45-1 through 45-6, 46-1, 74-1 and 74-2, 83-

---

[7] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' . . . for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

[8] The undersigned has carefully reviewed, the exhibits found at Docs. No. 41-3, 41-4, 41-5, 41-7, 41-8 and 41-9, which contain body camera video from police officers who responded to the trailer park on February 18, 2020. The videos show various stages of the operation and are taken from the various perspectives of the officers in their various roles. As a whole, the footage begins shortly before noon on February 18 and concludes around 2:30 p.m. on the same day.

1). Although Brannon filed an amendment to his Complaint, (Docs. No. 34, 34-1) and responses to Defendants' filings (Docs. No. 53, 54, 55, 71, 75, 84 and 87), the Court cannot consider any statements therein in deciding summary judgment because they are neither sworn nor verified in accordance with 28 U.S.C. § 1746. *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) ("Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment.") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003)).

On February 18, 2020, Defendant Patterson[9], a member of the Twenty-Second Judicial Circuit Drug Task Force, was ordered by his task force commander to assist Opp police officers in arresting Brannon on a domestic violence warrant. (Doc. No. 41-2 at 2-4; Doc. No. 74-2 at 2.) According to Patterson, at that time, he was aware of Brannon's history of felony arrests for drug possession, drug distribution, and drug trafficking. (Doc. No. 74-2 at 2.) Patterson testified that the domestic violence warrant was issued by the Opp Municipal Court based upon information given by Brannon's wife, Cassandra Henderson. (Doc. No. 74-2 at 2; Doc. No. 41-2 at 2-4.) When Henderson arrived at the Opp Police Department to obtain the warrant, she also told police officers that Brannon had large

---

[9] Andalusia Police Sergeant Mike Hayden is responsible for information technology and video storage for the Andalusia Police Department. He testified that Defendant Patterson's body camera files from the February 18, 2020, arrest, and many other files as well, were destroyed when the Department's server crashed. (Doc. No. 83-1 at 2.) However, the undersigned has reviewed body camera video from other officers present at the scene including Defendant Koerner (Doc. No. 41-3), Captain Inabinett (Doc. No. 41-4), Sergeant McCullough (Docs. No. 41-5 and 41-7), Sergeant Cowart (Doc. No. 41-8), and Officer Holland (Doc. No. 41-9). The body camera video footage is consistent with Defendants Patterson and Koerner's affidavit testimony. (Doc. No. 74-2 at 1-10; Doc. No. 41-23 at 1-29.)

amounts of methamphetamine and synthetic marijuana in a cooler inside their trailer and that she had seen those drugs inside their trailer within the past seventy-two hours. (Doc. No. 74-2 at 2-3.)

As Patterson and other officers arrived in the area of the Brannon-Henderson trailer, located at Lot 38 in Childre Trailer Park, they observed a black four-door sedan, which Brannon was known to drive, leaving the Brannon-Henderson trailer. (Doc. No. 74-2 at 3-4.) The black sedan was stopped and the driver, Reginald Thompson, was detained and searched by other officers. (Doc. No. 74-2 at 4-5.) Patterson was informed that a trafficking amount of methamphetamine had been recovered from inside the black sedan. (Doc. No. 74-2 at 5.)

Patterson proceeded to the Brannon-Henderson trailer by foot and arrived after Opp Police Investigator Thomas Price. (Doc. No. 74-2 at 4.) Price advised Brannon he was under arrest for domestic violence based on the warrant. (*Id.*) Patterson searched Brannon and discovered in his left front pants pocket a gallon-size plastic bag, which contained a synthetic controlled substance. (*Id.*) Patterson then advised Brannon that he was also under arrest for possession of a controlled substance, and handcuffed him. (Doc. No. 74-2 at 5.) Patterson advised Brannon of his Miranda rights. (*Id.*) During this time, other officers detained two men, Tony Ray Starling and Jason Grady Lawson, who were in a white pick-up truck near the Brannon-Henderson trailer. (Doc. No. 74-2 at 5-6.)

Drug Task Force Commander Mark Odom ordered Patterson and other officers to clear[10] the trailer. Patterson testified that he was not privy to all information upon which that order was based, but he was aware he was a part of a felony drug investigation, and he knew when the officers arrived that Brannon, Thompson, Starling and Lawson were present in the area of the trailer. (Doc. No. 74-2 at 6-7.) Patterson also knew that Thompson had tried to flee in the black sedan, and that the officers had recovered a trafficking amount of methamphetamine from the black sedan. (Doc. No. 74-2 at 7.) Additionally, Patterson personally discovered a synthetic controlled substance on Brannon's person. (*Id.*) Patterson testified that he was aware from past experience that drug traffickers work with associates and that they are often armed and dangerous. (*Id.*) Further, he knew that a resident of the trailer, Henderson, was cooperating with the investigation and had provided information about the trailer to one of the Opp investigators. (*Id.*) Patterson testified that he "relied on Commander Odom's superior knowledge of the situation when [he] complied with his order to clear the trailer [and that he] had no reason to question Commander Odom's determination that we had a lawful basis to clear the trailer." (*Id.*)

Patterson and other officers cleared the trailer in two minutes and confirmed that the trailer was unoccupied. (*Id.*) After the trailer was cleared, no one reentered the trailer until Commander Odom obtained a search warrant. (*Id.*; Doc. No. 41-12 at 1-3.) Once the warrant was obtained, Patterson searched inside the trailer and surrounding premises. (Doc.

---

[10] According to Patterson, "[t]o 'clear' a building means to ensure no one is hiding inside who could destroy evidence or launch an attack by, for example, shooting at [police] from inside." (Doc. No. 74-2 at 6.)

No. 74-2 at 8.) The search produced the following: a hand-rolled cigar containing a synthetic controlled substance, a partially smoked synthetic roach, sixty-three grams of methamphetamine, digital scales and multiple pieces of jewelry. (*Id.;* Doc. No. 41-12 at 5.) After executing the search, Patterson and other officers left the trailer with Henderson. (Doc. No. 74-2 at 8.) Patterson specifically testified that he did not "give any of Brannon's property or dogs to anyone."[11] (*Id.*) He further testified that other than the synthetic controlled substance, which he recovered from Brannon's person, the only items removed from the trailer area were the items seized pursuant to the search warrant. (Doc. No. 74-2 at 8-9; Doc. No. 41-12 at 5.) Finally, Patterson explained that he charged Brannon with trafficking in methamphetamine, two counts of unlawful possession of a controlled substance, and two counts of unlawful possession of drug paraphernalia. (Doc. No. 74-2 at 9.) Brannon was booked in the Covington County Jail on those charges. (*Id.*)

Koerner testified that she was not involved in any of the events leading up to Brannon's arrest. (Doc. No. 41-23 at 1-5.) According to Koerner, she responded to Childre Trailer Park around noon on February 18, 2020, in her capacity as an Opp police officer, to assist the officers present at Brannon's trailer. (Doc. No. 41-23 at 3.) She testified that she knew Brannon and Henderson were legally married and shared the residence at Lot 38 as husband and wife because she had previously arrested Brannon following a child abuse investigation. (Doc. No. 41-23 at 2.) She also knew that Brannon had a history of felony

---

[11] None of the police body camera video shows Patterson or any other officer aiding Henderson in removing personal items from the trailer.  (Docs. No. 41-3, 41-4, 41-5, 41-7, 41-8 and 41-9.)

arrests for drug possession, drug distribution, and drug trafficking. (Doc. No. 41-23 at 2-3.)

Upon her arrival, Koerner found Brannon and Thompson under arrest and secured in a marked patrol vehicle, and Starling and Lawson detained by a white pickup truck parked at Lot 38. (Doc. No. 41-23 at 3.) The scene was controlled by the agents of the Twenty-Second Judicial Circuit Drug Task Force. (*Id.*) Koerner did not participate in the clearing[12] of Brannon's trailer. (Doc. No. 41-23 at 6.) Although she was present when it occurred, she did not know the clearing had been ordered or that it was occurring until it was completed. (*Id.*)

Koerner recalled that at 12:23 p.m. Commander Odom and Price left the scene to apply for the search warrant, while she and the other officers waited at the scene. (*Id.*) She specifically testified that she "did not enter the residence at Lot 38 on February 18, 2020, before the search warrant was obtained . . . [she] never removed any property from inside the residence . . . [or] t[ook] any of the items listed on pages 4 and 5 of Mr. Brannon's [unattested] amendment to the complaint." (Doc. No. 41-23 at 6.)

When Henderson arrived at the scene shortly after 1:00 p.m., she told Koerner that she was moving out and Koerner offered to assist her by arranging a stay in a local domestic violence shelter. (Doc. No. 41-23 at 7.) Koerner and Henderson also discussed future care for the five dogs on the property.[13] (*Id.*) Koerner testified that Henderson asked her to

---

[12] Koerner referred to the "clearing" as a "protective sweep." (Doc. No. 41-23 at 16.)

[13] Koerner testified that she "knew Mr. Brannon was going to jail and did not know how long he would be incarcerated[,] … that [he] had prior charges pending for which his bond was likely to

relocate the dogs and that she believed Henderson shared authority of the dogs with Brannon. (*Id.* at 8.) Koerner testified that she also believed Henderson had the authority to transfer ownership because Henderson and Brannon were legally married and lived in the trailer together.[14] (*Id.*)

Koerner also testified that she saw one of the dogs had a broken foot. She testified that Henderson told her that "[Henderson] saw Mr. Brannon break the dog's foot by slamming the dog on the ground repeatedly because the dog had escaped from its pen." (*Id.* at 7.) Koerner further testified that because of its young age, she took a puppy and found it a new home the next day. (*Id.* at 9.) According to Koerner, she returned to Lot 38 twice daily for more than a week to feed the remaining dogs at her own expense. (*Id.*) She was the only one feeding the dogs during that time. (*Id.*) Koerner eventually found new homes for the four remaining dogs. (*Id.*) She further testified that she received no payment for the dogs and did not keep any of the dogs for herself. (*Id.*)

During Henderson and Koerner's interaction, April Lee, the individual with whom Henderson planned to live after moving out of the trailer, arrived on the scene. (Doc. No. 41-24 at 16;[15] Doc. No. 41-25 at 1.) Lee provided affidavit testimony that she advised Henderson the dogs could not come to her home. (Doc. No. 41-25 at 1.) She also testified that she overheard the discussion between Koerner and Henderson about the future care

---

be revoked[,] … [and] there would be no one left to feed and care for the dogs after Ms. Henderson moved out." (Doc. No. 41-23 at 7.)

[14] Notably, other evidence supports this testimony as the body camera footage showed that the dogs on the property responded to Henderson's commands. (Doc. No. 41-7; Doc. No. 41-8.)

[15] Photographic evidence establishes that Lee was onsite as Koerner stated. (Doc. No. 41-24 at 16.)

for the dogs. (*Id.*) Specifically, Lee testified that she heard Henderson ask Koerner to find a home for the dogs. (*Id.*) Koerner testified that when she left the Childre Trailer Park, Henderson was still moving property out of the trailer. (Doc. No. 41-23 at 9.) Koerner testified that she believed, because Henderson and Brannon were legally married, Henderson was legally entitled to remove the property and that she had no legal authority to prevent her from doing so. (*Id.*) Koerner did not assist Henderson or anyone else in removing any property from the residence. (*Id.*)

On February 22, 2020, Brannon's brother, Willie English, and Koerner met at the Brannon-Henderson trailer and discussed care of the dogs and entry into the trailer. (Doc. No. 41-23 at 9-10; Doc. No. 70-3 at 1.) According to English, Koerner refused to allow him to remove items from the residence and informed him that if he did remove items from the trailer he would go to jail. (Doc. No. 70-3 at 1.) English testified he advised Koerner that Brannon gave him permission to take care of the dogs while Brannon was in custody. (*Id.*) English testified that one dog had a broken leg because it had been hit by a car. (*Id.*) He also testified that Koerner informed him that she "had a family that was going to take care of [the dogs] so she took them off and gave them away." (*Id.*) According to Koerner, English requested to enter the residence, and she told him that she could not give him permission to enter the trailer. (Doc. No. 41-23 at 9-10.) Koerner also testified that English asserted that Brannon had given him permission to enter the residence. (*Id.* at 10.) Koerner testified that she recommended to English that he also obtain permission from Henderson to enter the trailer. (*Id.* at 10.) Koerner further testified that she "did not prevent" English

from entering the residence, "did not prohibit" him from entering the residence, and "did not threaten" him. (*Id.*)

## V.    DISCUSSION

In his Complaint,[16] Brannon asserts three grounds for relief. First, he alleges that an "unreasonable search and seizure" occurred when, in the course of arresting him for felony domestic violence, Patterson searched his person and retrieved a "small amount of synthetic from [his] pocket," then "went on to get a search warrant for [his] property after they had already been inside [his] home." (Doc. No. 1 at 2, 4.) Second, he alleges that police unreasonably searched his home, unlawfully seized his property, gave property to Henderson, and left the residence "open for other property to be stolen." (*Id*. at 4.) Third, he alleges that Koerner unlawfully seized his property by refusing to allow English to enter the home "to get property and secure [his] home[,]" and she took his five dogs. (*Id*. at 3, 5.)

### A.    Claims against Defendant Patterson

The undersigned views Brannon's claim against Patterson in two parts – (1) the allegedly illegal search of his person and (2) the allegedly illegal searches of his trailer and seizure of items pursuant to those searches.[17]

---

[16] The Amendment to Brannon's complaint contains additional details relating to his alleged damages, but it does not provide additional causes of action or additional facts that could be construed as supporting any additional grounds for relief. (Doc. No. 34-1.)

[17] It is undisputed that Koerner was not involved in any of the events leading up to Brannon's arrest. (Doc. No. 41-23 at 1-5.) Nor was she involved in the two-minute sweep of Brannon's trailer. (*Id.*)

The undersigned will address Brannon's claim for illegal search of his person following his arrest first. "Among the exceptions to the [search] warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). It is undisputed that Patterson[18] arrested Brannon pursuant to a valid arrest warrant based upon a charge of domestic violence, which was issued after Henderson filed a domestic violence complaint.[19]  (Doc. No. 1-1 at 1; Doc. No. 41-1 at 1-4, Doc. No. 41-2 at 1-4; Doc. No. 74-

---

[18] There is some discrepancy in the evidence as to whether Patterson was the arresting officer, but that factual discrepancy makes no material difference to the outcome in this case. (*See* Doc. No. 1-1 at 1 (Brannon's verified statement that Patterson arrested him for domestic violence); Doc. No. 74-2 at 4 (Patterson's affidavit that Price informed Brannon he was "under arrest for domestic violence based on the warrant").)

[19] Brannon states in his Complaint that Patterson "came onto [his] property and arrested [him] for Felony Domestic Violence III." (Doc. No. 1 at 4.) In a verified attachment to the Complaint, Brannon also states that Patterson arrested him on the charge of "Felony Domestic Violence III." (Doc. No. 1-1 at 1.)  He also included the following in his verified statement:

> I want the Court to Keep in mind that I was out on bond for Trafficking Synthetic (DC-2018-251 & 252) and Felony Domestic Violence III (CC-2019-35) so any new charge of Domestic Violence III would be a Felony Domestic Violence.

(Doc. No. 1-1.)

Later, in a brief, Brannon argues that he was "arrested for <u>Felony</u> Domestic Violence III, a charge that didn't exist," and that "[n]o one Ever arrested [him] for Domestic Violence III, nor have I been to court for this charge." (Doc. No. 64 at 1 (sic)). Elsewhere, Brannon contends that "[he] was arrested solely on the charge of felony domestic violence (a charge that didn't exist)," but that "no one on this date of February 28, 2020, arrested me for domestic violence or drugs." (Doc. No. 75 at 1.)

While it is unclear what Brannon is trying to argue regarding the actual grounds for his arrest, the record contains a copy of the arrest warrant issued on February 18, 2020, for the arrest of Letterron D'Jon Brannon on the charge of "DOMESTIC VIOLENCE 3RD (ASSAULT)" in violation of Ala. Code 1975 § 13A-6-132. (Doc. No. 41-2 at 2.) It also contains the February 16, 2020 criminal complaint containing Henderson's allegation that Brannon hit her and knocked her unconscious, giving her a bloody nose in the process. (Doc. No. 41-1 at 3-4.) Brannon makes no coherent argument that the arrest warrant or the arrest were invalid.

2 at 2-3.) It is undisputed that, in the course of the arrest, Patterson searched Brannon and discovered in his left front pants pocket a gallon-size plastic bag containing a synthetic controlled substance. (*Id.*; *see also* Doc. No. 1 at 4 (Brannon's allegation that, "[o]nce [he was] arrested, they search[ed] his person" via Patterson's "pat-down search" that yielded "a small amount of synthetic" from Brannon's left front pocket).) At that time, Patterson advised Brannon he was also under arrest for possession of a controlled substance,[20] and he handcuffed Brannon and advised him of his Miranda rights. (Doc. No. 74-2 at 5.) Because Brannon was arrested based on a valid arrest warrant and was searched in the course of that arrest, he cannot prevail on his claim that the search of his person was illegal. *See United States v. Robinson,* 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."). The undersigned finds no genuine issue as to any material fact on this issue.

The undersigned next turns to Brannon's claim that the search of his trailer and subsequent seizure of his property violated the Fourth Amendment. According to the evidence, two searches were made of the trailer. The undersigned will consider their lawfulness in turn.

First, the undersigned considers the lawfulness of the protective sweep Patterson and another officer conducted. (Doc. No. 74-2 at 7.) A warrantless non-consensual entry

---

[20] In addition to finding the controlled substance on Brannon's person, Patterson was aware that, upon her arrival at the Opp Police Department to file the domestic violence complaint, Henderson had told police officers that Brannon had large amounts of methamphetamine and synthetic marijuana in a cooler inside their trailer and that she had seen those drugs inside their trailer within the past seventy-two hours. (Doc. No. 74-2 at 2-3.)

into an arrestee's home following an arrest outside the home[21] is justified when both probable cause and exigent circumstances are present. *See United States v. Rodgers,* 924 F.2d 219, 222-23 (11th Cir. 1991). An officer may enter a home without a warrant or consent to conduct a protective sweep when the officer has a reasonable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie,* 494 U.S. 325, 334 (1990). Alternatively, an officer may enter a home without a warrant or consent when the officer has probable cause to believe there is contraband inside the home and there is a "danger that the evidence will be destroyed or removed." *Rodgers,* 924 F.2d at 222 (citations omitted).

The undisputed facts demonstrate that Patterson's entry into the trailer was supported by the requisite reasonable suspicion and was limited in scope to the purpose of the protective sweep. Prior to the sweep, Brannon was arrested on a domestic violence warrant and on charges of drug possession after Patterson found a gallon-size plastic bag containing a synthetic controlled substance on Brannon's person. (Doc. No. 74-2 at 4.) Thereafter, Drug Task Force Commander Odom ordered Patterson and other officers to clear the trailer prior to obtaining a search warrant. (Doc. No. 74-2 at 6-7.) Patterson testified that he was not privy to all information upon which that order was based, but he was aware he was a part of a felony drug investigation, and he knew when the officers arrived that Brannon and three other men were present at the scene. (*Id.*) Further, he knew Thompson had tried to flee in the black sedan from which the officers had recovered a

---

[21] Brannon was arrested outside the trailer. (Doc. No. 74-2 at 4-5.)

trafficking amount of methamphetamine. (Doc. No. 74-2 at 7.) Patterson was aware from past experience that drug traffickers work with associates and that often times they are armed and dangerous. (*Id.*) Patterson himself had discovered the gallon-size bag of what appeared to be drugs when he searched Brannon while arresting him based on the domestic violence warrant. (*Id.*) Additionally, Patterson knew that a resident of the trailer, Henderson, was cooperating with the investigation and had provided information about the trailer to one of the Opp investigators. (*Id.*) Patterson testified that he "relied on Commander Odom's superior knowledge of the situation when [he] complied with his order to clear the trailer [and that he] had no reason to question Commander Odom's determination that we had a lawful basis to clear the trailer." (*Id.*) Patterson and other officers cleared the trailer in two minutes. (*Id.*) They "quickly checked the areas in which a person could have been hiding, determined that the trailer was unoccupied, and immediately exited." (*Id.*). During that time, Patterson and officers seized nothing. (*Id.*) After the trailer was cleared, no one reentered the trailer until Commander Odom obtained a search warrant. (*Id.*)

Based on the undisputed facts, the undersigned concludes that prior to conducting the sweep as ordered by Commander Odom, Patterson had reason to suspect that other individuals may have been hiding in the trailer, *Buie,* 494 U.S. at 334; that the trailer likely "harbor[ed] an individual posing a danger to those on the arrest scene," *Maryland,* 494 U.S. at 334; and that contraband was present in the trailer which could be destroyed, *Rogers,* 924 F. 3d at 222-23. The undisputed evidence before the court establishes that the search was limited in scope to the purpose of a protective sweep, and no items were seized.

Hence, the sweep of the trailer was lawful, and no unlawful seizure of Patterson's property occurred during the protective sweep. The undersigned finds no genuine dispute as to any material fact on this issue.

Second, the undersigned considers Brannon's claim against Defendant Patterson for the search of the residence and the items seized. After the protective sweep, a search was conducted after a valid[22] search warrant had been obtained.[23] *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) ("We have … recognized a few permissible invasions of the home and its curtilage. Perhaps most familiar, for example, are searches and seizures pursuant to a valid warrant."). Pursuant to the warrant, Patterson searched inside the trailer and surrounding premises and seized items belonging to Brannon. (Doc. No. 74-2 at 8.) That search produced the following: a hand-rolled cigar containing a synthetic controlled substance, a partially smoked synthetic roach, sixty-three grams of methamphetamine, digital scales and multiple pieces of jewelry. (*Id.*) After executing the search and seizing the items listed above, Patterson and other officers left the trailer in Henderson's care as she had arrived on scene and was present when they departed. (*Id.*) Patterson specifically testified that he did not "give any of Brannon's property or dogs to anyone." (*Id.*) He further testified that other than the synthetic controlled substance he recovered from Brannon's pocket during the pat-down, the only items removed from the trailer area were the items seized pursuant to the search warrant. (Doc. No. 74-2 at 8-9; Doc. No. 41-12 at 5.) Accordingly, there is no

---

[22] In response to Patterson's motion for summary judgment, Brannon makes no cogent argument and presents no evidence that the search warrant for the residence and premises was invalid.

[23] The search warrant, return, and inventory are in the record. (Doc. No. 41-12 at 2-5.)

evidence before the court to support Brannon's claim that Patterson unlawfully seized his property and gave it away to Henderson after issuance of the search warrant. The undersigned finds no genuine dispute as to any material fact on this issue.

In short, Patterson is entitled to summary judgment on Brannon's Fourth Amendment claims for the search of his person, searches of his trailer, and seizure of items from the trailer pursuant to the search warrant.

## B.    Claims against Defendant Koerner[24]

Brannon claims that, following his arrest, Koerner failed to secure his trailer and prevented Brannon's family from securing the property, which resulted in a loss of his personal property and his five dogs. Specifically, he claims that Koerner violated the Fourth Amendment by relocating his dogs, by failing to secure his property during the search of his trailer, and by preventing his brother from checking on his property after he was in jail. (Doc. No. 1 at 5.)

---

[24] Some of Brannon's purported claims alleged against Koerner fail on their face. First, it is undisputed that Koerner arrived at the scene after Brannon's arrest and the search of his person, (Doc. No. 41-23 at 1-5), and other than being present at the scene, Koerner did not participate in any manner in the sweep of Brannon's trailer and was not aware it was occurring until it was completed. (Doc. No. 41-23 at 6.) Brannon provides no testimony or evidence to contradict Koerner's testimony on this point. (Docs. No. 64, 69, 70-1 through 70-5; 86-1 through 86-3, 95-1.) Accordingly, Brannon's claim against Koerner for unlawful search of his property fails.

Second, to the extent that Brannon claims Koerner violated his Fourth Amendment rights when she allegedly accompanied Henderson to sell his 1994 Chevy Caprice, which he admits was titled in Henderson's name, that claim must fail. (*See* Doc. No. 69 at 3-4.) This claim fails on its face because Brannon admits Henderson held the title and, thus, had the legal right to sell the car. (*Id.*)

The Fourth Amendment prohibition against a warrantless search and seizure does not apply when "voluntary consent has been obtained, either from the individual whose property is searched, . . . or from a third party who possesses a common authority over the premises." *Illinois v. Rodriquez,* 497 U.S. 177, 181 (1990) (citations omitted). "A third party's consent is valid if [s]he has mutual use of the property, with joint access to or control of the [property] for most purposes." *United States v. Harris,* 526 F. 3d 1334, 1339 (11th Cir. 2008) (citations omitted).

Koerner admits that during Brannon's arrest on February 18, 2020, she began efforts to relocate Brannon's dogs at Henderson's request.[25] (Doc. No. 41-23.) She believed Henderson shared authority of the dogs[26] with Brannon and had the authority to transfer ownership because she and Brannon were legally married and lived in the trailer together. (Doc. No. 41-23 at 8-9.) Importantly, Koerner testified that she knew Brannon and Henderson were legally married because she had previously arrested Brannon in the course of a prior child abuse investigation. (*Id*. at 2.) Brannon has presented testimony acknowledging that he was married to Henderson at the time that the incident at issue occurred. (*See* Doc. No. 69 at 4 ("On or about September or October 2020, I talked with Cassandra Henderson. She had told me that she filed for a divorce …."); Doc. No. 69 at 5

---

[25] Lee, who was present at the scene and with whom Henderson planned to live after leaving the trailer, confirmed that Henderson asked Koerner to find a home for the dogs. (Doc. No. 41-25 at 1.) Brannon has provided no evidence which contradicts this testimony.

[26] Though it is disputed how the foot of a dog was broken, the undersigned finds that such fact is not material to the resolution of the matters before the court on summary judgment.

("On or about September or October 2020, I get the final decree of Cassandra Henderson and my Divorce. (sic)").)

Even though English, a third-party, verbally advised Koerner of his purported responsibility for the dogs at Brannon's request, it remains undisputed that Koerner's actions in rehoming the dogs were taken at the behest of <u>one</u> of their legal owners, Henderson. (Doc. No. 41-23 at 8.) English's verbal statement to Koerner that Brannon had given him responsibility for the dogs does not change the lawfulness of Koerner's actions, which were based on prior consent from Henderson. *See Harris,* 526 F. 3d at 1339 ("A third party's consent is valid if [s]he has mutual use of the property, with joint access to or control of the [property] for most purposes.") The undersigned finds no genuine issue of material fact on this claim. Accordingly, summary judgment is due to be granted on Brannon's claim that Koerner violated his Fourth Amendment rights by relocating his dogs because Brannon has failed to demonstrate that Koerner's actions were unreasonable. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'").

Brannon also claims that Koerner violated his Fourth Amendment rights by failing to prevent Henderson from removing jointly owned property from the trailer, and by assisting her in removing that property. (Doc. No. 1 at 4; Doc. No. 69 at 5.) Brannon asserts that the *police* assisted Henderson in removing the property. (Doc. No. 69 at 5 (Brannon's affidavit stating that "Henderson told [him] that the *police* helped her remove these [heavy] items" from the trailer") (emphasis added).) However, even if that were true, it does not contradict the otherwise undisputed evidence, which absolves *Koerner* of any participation

in the removal of items from the trailer on Henderson's behalf. Koerner testified that, during the arrest, *she* personally "never removed any property from inside the residence." (Doc. No. 41-23 at 6.) Brannon presented no evidence which refutes that testimony. Koerner admits that she was fully aware Henderson was removing property from the jointly owned trailer on the date of Brannon's arrest. (*Id*. at 9.) However, because Koerner believed that Brannon and Henderson lived in the trailer as husband and wife and were legally married, she believed she had no authority to prevent Henderson from removing the property.[27] (*Id*.). In short, Brannon's Fourth Amendment claims against Koerner fail because they are based upon the actions of Henderson, a private citizen,[28] and (at most) the actions of unknown police officers. The claims also fail because Koerner had no constitutional duty to stop Henderson from removing property from the trailer.[29] In other words, even if Henderson had no legal right to remove items from the trailer, the action by her of taking the items does not trigger the Fourth Amendment. *See United States v. Brillhart*, No. 2:22-CR-53-SPC-NPM, 2023 WL 3304278, at *5 (M.D. Fla. May 7, 2023)

---

[27] It is undisputed that Henderson was moving out of the trailer. It is not unreasonable to expect that someone will move their property out with them when they move out of a residence.

[28] Brannon makes no cogent argument and presents no evidence that Henderson was a state actor. *See Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992); *Heaggins v. Thomas*, No. CV419-024, 2019 WL 1244720, at *2 (S.D. Ga. Mar. 18, 2019) ("To be liable under § 1983, a defendant must be a 'state actor.'"), *report and recommendation adopted*, No. 4:19-CV-24, 2019 WL 1782128 (S.D. Ga. Apr. 23, 2019). Neither does Brannon bring a constitutional claim against Henderson.

[29] *See DeShaney v. Winnebago County Dept. of Soc. Servs*. 489. U.S. 189, 195 (1989) ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.").

("The Fourth Amendment protects individuals from government actors, not private ones.").
Accordingly, summary judgment is due to be granted on these claims.

Likewise, summary judgment is due to be granted on Brannon's claim that Koerner
violated his Fourth Amendment rights by refusing to allow his brother to secure his
property during his incarceration. Brannon fails to demonstrate that Koerner acted
unreasonably under the circumstances. *See, Brower,* 489 U.S. at 599. Indeed, both Koerner
and Brannon's brother, Willie English, testified that on February 22, 2020, they met at the
Henderson-Brannon trailer. (Doc. No. 41-23 at 9-10; Doc. No. 70-3 at 1.) According to
English, Brannon "told [him] … to go get [Brannon's] property out of his trail[er]." (Doc.
No. 70-3 at 1.) According to English, when he arrived to remove Brannon's property from
the trailer on Saturday, February 22, 2020, Koerner "pulled up and said [he] couldn't get
[anything] out of the residen[ce] and if [he] did [he] would go to jail." (*Id.*) Koerner testified
she told English that she could not give him permission to enter the trailer because it was
owned by Brannon and Henderson. (Doc. No. 41-23 at 9-10). When English claimed that
Brannon had given him permission to enter, Koerner told English that he should get
permission from Henderson as well. (*Id.*) Brannon does not present any legal authority that
Koerner was constitutionally obligated to allow English into the trailer or to aid either
spouse in taking property for themselves.[30] Thus, Brannon cannot prevail on his claim

---

[30] In fact, Brannon is adamant that Henderson should not have removed the marital property until
a divorce court divided it equally, and, thus, the police should not have helped her remove any
marital belongings when she moved out on the date of Brannon's arrest. (Doc. No. 55 at 1.)
Brannon cites no legal authority for this position, but, even if it were so, then the police (including
Koerner) likewise should not have assisted *Brannon* (or someone who claimed to be sent by
Brannon) in removing the property before it was divided by a divorce court. Thus, even under

against Koerner based on her alleged refusal to allow English to enter the trailer to remove or secure property from it on Brannon's behalf.[31] Summary judgment is warranted.

## VI.    CONCLUSION

Based on the foregoing, the undersigned RECOMMENDS as follows:

1.    The motion for summary judgment filed by Defendants Turman and White (Doc. No. 45) be DENIED as moot.

2.    The remaining motions for summary judgment (Docs. No. 41, 74) be GRANTED.

3.    Judgment be ENTERED with prejudice in favor of Defendants Patterson and Koerner and against Plaintiff Letterron Djon Brannon.

4.    This case be DISMISSED.

It is further ORDERED that, on or before **August 27, 2024**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

---

Brannon's theory, Koerner was under no obligation to assist English or Brannon in removing the marital property for Brannon.

[31] *See Smith v. Montgomery Cnty., Alabama*, No. 2:22-CV-307-ECM-JTA, 2023 WL 8610122, at *5 (M.D. Ala. Oct. 24, 2023), *report and recommendation adopted*, No. 2:22-CV-307-ECM, 2023 WL 8607006 (M.D. Ala. Dec. 12, 2023) ("[A]s a substantive matter, '[t]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" (quoting *DeShaney*, 489 U.S. 189, 196 (1989)).

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

The Clerk of the Court is DIRECTED to correct the docket sheet to reflect the correct spelling of Defendant Heather Koerner's name.

DONE this 12th day of August, 2024.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE